UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBYN SENIOR,<br><br>*Plaintiff*,<br><br>*v.*<br><br>STATE OF CONNECTICUT<br>WORKERS' COMPENSATION<br>COMMISSION, THIRD DISTRICT,<br><br>*Defendant*. | Civil No. 3:17-cv-1205 (JBA)<br><br>May 31, 2019 |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robyn Senior ("Senior") brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*, claiming that she was retaliated against by her employer, the State of Connecticut Workers' Compensation Commission, Third District, because of Senior's opposition to religious discrimination in the workplace. For the reasons set forth below, the Court GRANTS Defendant's Motion for Summary Judgment.

**I.  Background and Summary Judgment Record**

The operative complaint is Plaintiff's Third Amended Complaint, filed December 29, 2017. ([Doc. # 25].) After the Court's Order on the Defendant's Motion to Dismiss ([Doc. # 34])—in which the Court dismissed Plaintiff's claim for hostile working environment—the remaining claim in this lawsuit is Count Two, which alleges that Plaintiff has been retaliated against for previous opposition to discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on May 28, 2015. (Parties' L.R. Stmts. [Doc. ## 40-2, 41-1] ¶ 3.) She began working for the Workers' Compensation Commission in 1987 and worked as a clerk in the Hamden office for about ten years before she was promoted to the role of processing technician. (*Id.* ¶¶ 4-5.) Plaintiff moved to the Hartford Office and then was transferred, at her request, to the New Haven office in 1998, where she has remained as a processing technician since. (*Id.* ¶ 6.) Plaintiff's supervisor, Dave Lawson, has been her supervisor the entire time she has worked in New Haven. (*Id.* ¶ 7.)

There are about ten to twelve people who work in the New Haven Office. Plaintiff is one of two processing technicians; the other is Helen Payne. (*Id.* ¶ 8.) Mr. Lawson supervises all of the employees in the New Haven office as the District Administrator. (*Id.*) There are three office assistants in the office: Debra Trimachi, Jennifer Nieves (formerly Watert), and Silveri Robinson. (*Id.* ¶ 9.) There is also a paralegal, Deborah Russo, and a court reporter, Robert Miller. (*Id.* ¶ 10.) Plaintiff's job duties are clerical in nature and she also does archiving for the office. (*Id.* ¶ 11.)

In 2005 and 2008, Plaintiff alleges that she witnessed her co-worker, Silveri Robinson, state that another co-worker, Jennifer Nieves, was the devil and was evil, and that Ms. Robinson would draw pictures and write letters, and that Plaintiff also witnessed Robinson tear pictures down from Nieves's wall. (*Id.* ¶ 12.) During the same time period, Plaintiff also allegedly witnessed Robinson running away from Nieves in the office. (*Id.* ¶ 13.) On another occasion, Plaintiff observed Robinson running away from Plaintiff's car in the parking garage "as though [Plaintiff] was going to hit her." (Ex. 1 (Senior Dep.) to Def.'s Mot. Summ. J. [Doc. # 40-3] at 30-31.)

Plaintiff also alleges that Ms. Robinson would hand out religious pamphlets in the office to Commissioners during the same time frame (2005) and would talk about Jesus and religion, which

2

continues to the current day. (Parties' L.R. Stmts. ¶ 15.) Plaintiff alleges that Ms. Robinson reads her Bible all the time, but that she does not really have contact with Ms. Robinson because she stays away from her. (*Id.* ¶ 16.) More recently, there was another incident between Ms. Robinson and an unnamed coworker, but Plaintiff does not know "what happened"; she "just heard a lot of commotion and a lot of pushing." (Senior Dep. at 34.) Plaintiff testified that "Sandra Cunningham, which is human resources, she came down and said that she was going [to] move Sil[]veri's seat." (*Id.*) Plaintiff was not involved. (*Id.*) At her deposition, Plaintiff testified that she could not think of any other incidents of religious harassment involving Ms. Robinson. (*Id.* at 31, 34.)

Plaintiff alleges that she complained about Ms. Robinson to her supervisor, Dave Lawson, to Sandra Cunningham in Human Resources and to her union. (Parties' L.R. Stmts. ¶ 19.) Plaintiff alleges that Ms. Nieves asked her to complain to Mr. Lawson about the incident in 2005 involving the pictures and Ms. Robinson running. (*Id.* ¶ 21.)

She complained to Lawson "all the time[,]" first doing so in the 2005-2008 period, and did so orally. (Senior Dep. at 35-36.) During this period, she specifically told him that "Sil[]veri was harassing Jennifer because of her religion[.]" (*Id.* at 37.) Plaintiff did not complain to Lawson about religious harassment by Silveri Robinson outside of the 2005-2008 time frame. (*Id.* at 38.) In addition to her oral complaints to Lawson, Plaintiff also wrote a letter about Robinson's behavior at some point in the 2005-2008 period. (*Id.* at 38-39.)

Plaintiff also complained to Sandra Cunningham in HR in 2008 or 2009, after Cunningham came down to meet with everyone in the office at Jennifer Nieves' request. (*Id.* at 40.) However, Plaintiff testified that Cunningham did not give Plaintiff a chance to elaborate on Robinson's behavior in any detail. (*Id.* at 41.) Plaintiff subsequently complained to Cunningham in phone calls about Robinson's behavior after Robinson "wrote a letter stating that . . . she almost fell down the

stairs and lost her life because . . . she heard [Plaintiff] coming." (*Id.* at 41-42.) Plaintiff told Cunningham that this had never happened and that if it did, Plaintiff "knew nothing about it." (*Id.* at 42.)

Plaintiff and her clerical coworkers (presumably including Nieves, but she did not specify) filed a union grievance claiming religious harassment by Robinson, which Cunningham "had . . . dismissed because she told the union she was going to move [Robinson] to another office[.]" (*Id.*) However, Cunningham never moved Robinson. (*Id.*)

Plaintiff testified that "we called CHRO" but otherwise she never participated in any EEOC or CHRO proceedings in support of Trimachi or Nieves. (Senior Dep. at 37.)

Plaintiff also testified that she complained after 2008 about Robinson on a regular basis but could not identify any specific occasions on which she did so because she always did so via phone calls. (*Id.* at 43-44, 49.)

Plaintiff alleges that after she complained about the alleged religious harassment, Mr. Lawson and Ms. Robinson harassed her. (Parties' L.R. Stmts. ¶ 26.) Plaintiff alleges Mr. Lawson harassed her by tampering with her work in 2010, by finding a check in her desk, and by putting her work in different folders so she could not find it. (*Id.* ¶ 27.) Plaintiff was never disciplined for any fallout from these incidents. (*Id.* ¶ 28.)

Plaintiff also alleges there was an incident with the mail a few years ago when her co-worker Helen did not open the mail, so Plaintiff complained to Mr. Lawson and he then asked Plaintiff if she opened the mail. (*Id.* ¶ 29.) Plaintiff alleges that Mr. Lawson would let others go to lunch and come in late and would remind Plaintiff to record her time. (*Id.* ¶ 30.) Plaintiff believes that Mr. Lawson's treatment of her is connected to the complaints she allegedly made about religious harassment in the 2005-2008 time frame because she knows his behavior and knows that he lets

other people, specifically Jennifer and Helen, do whatever they want to do. (*Id.* ¶ 31.) Plaintiff also believes that Mr. Lawson was retaliating against her because a co-worker named Tony used to "say things" and because Mr. Lawson allegedly said that he "doesn't care what those bitches do as long as the work gets done." This was in either 2009 or 2010. (*Id.* ¶ 32.)

Plaintiff also believes Lawson was retaliating against her based on comments made by other coworkers, because of the fact that "he told the staff a few times that [Plaintiff was] throwing them all under the bus[.]" (Senior Dep. at 57.)

Plaintiff alleges that she was told by Mr. Lawson in 2009 or 2010 through 2011 that she would be transferred if she complained about Ms. Robinson, but that Plaintiff has never been transferred. (Parties' L.R. Stmts. ¶ 34.) Plaintiff alleges that Mr. Lawson sent an email to Ms. Cunningham on June 30, 2008 regarding a workers' compensation claim that Plaintiff had filed in which he stated that Plaintiff or anyone else could put their names on a transfer list. (*Id.* ¶ 35.) Plaintiff never put her name on a transfer list. (*Id.*) Nothing else was ever put in writing about a transfer by either Mr. Lawson or Ms. Cunningham. (*Id.*)

Plaintiff alleges that she was told by Mr. Lawson and Ms. Cunningham that she could be transferred far away from her home, which she took to mean either Norwich or Stamford. (Parties' L.R. Stmts. ¶ 37.) Plaintiff was not told that there would be a change in her job duties or her hours. (*Id.*) Plaintiff is not aware of any other employees from her office who have been transferred. (*Id.* ¶ 38.)

Plaintiff testified that "it is possible" that Lawson threatened to transfer her as recently as February 2015, as Plaintiff alleged in the complaint, that she is "sure that he did" so in that year because "that was the reason for the 2015 letter[,]" and that "Dave says stuff all the time" but that she "really [does not] remember yearwise[.]" (Senior Dep. at 65.)

5

In her 2008 review, Plaintiff was rated overall "Good" but was rated as fair in the category of ability to deal with people, with the written comment by Lawson that she had "created a hostile working environment for Sil[]very Robinson." (*Id.* at 69-70; Parties' L.R. Stmts. ¶ 39.) After taking the matter to her union, this part of the review was voided. (Senior Dep. at 70-72.)

On May 10, 2016, Ms. Trimachi complained to office supervisors about religious discrimination by Robinson. (*Id.* at 77.) Plaintiff "heard what went on[,] [b]ecause there was an incident that went on near [Trimachi's] desk" between Trimachi, Robinson, and Lawson. (*Id.* at 78.) In that incident, Trimachi complained about Robinson proselytizing in the office. (*Id.*) Cunningham "came down" and asked everyone whether they had observed the incident. (*Id.*) Plaintiff told Cunningham that she had heard the incident but refused to go speak alone with Cunningham to tell her about it because, in Plaintiff's words, "I do not go in the office alone with her anymore because she doesn't tell the truth." (*Id.* at 78-79.)

Plaintiff clarified that she cannot recall any time other than 2008 when either Lawson or Cunningham said she would or could be transferred. (Parties' L.R. Stmts. ¶ 42.)

Plaintiff has been evaluated by Mr. Lawson since 1997 when she moved to the New Haven office. (Parties' L.R. Stmts. ¶ 43.) Her overall rating in every evaluation from 1997 to 2018 has been either "Good" or "Very Good." (*Id.* ¶¶ 43, 39.)

**II.  Discussion**

**A. Legal Standard**

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R.

6

Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

### B. Retaliation

Retaliation claims are reviewed under the burden-shifting framework set forth in *McDonnell Douglas. Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). "To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2d. Cir. 1998). Additionally, the protected activity must be to have been a "but for" cause of the alleged adverse action by the employer; it is no longer sufficient for plaintiff to show merely that the adverse employment action was a substantial or motivating factor for the alleged retaliation. *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2534 (2013). Defendant argues that Plaintiff cannot make out a prima facie case for her retaliation claim or establish that Defendant's stated reasons for its actions were pretextual. According to Defendant, "Plaintiff's retaliation claim fails because Plaintiff . . . cannot

show[] a causal connection between any alleged adverse employment action/retaliatory hostile work environment and the alleged retaliation, . . . that she has suffered an adverse employment action[,] . . . protected activity[,] . . . [or] retaliatory hostile work environment." (Mem. Supp. Mot. Summ. J. at 6.)

As a threshold issue, however, Defendant argues that Plaintiff's retaliation claim is time barred because all of the claimed retaliation occurred no later than 2011, and Plaintiff did not file her CHRO complaint until May 28, 2015. Plaintiff responds that this "argument fails because there is sufficient evidence before the court to support a jury conclusion that the last affirmative act of retaliation took place less than four months before the plaintiff filed her EEOC / CHRO complaint."

At oral argument, Plaintiff clarified that the only adverse employment actions that she challenges now are the claimed threats to transfer her to another office. As discussed in the Order on the Motion to Dismiss, the Court does not doubt that a threat by a supervisor to transfer an employee to a different job location substantially farther away from home could dissuade a reasonable worker from making or supporting a charge of discrimination. As the Supreme Court held, "[c]ontext matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (internal quotation marks and citation omitted). The material adversity standard is "phrase[d] . . . in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.*

Here, however, all of the specific threats that Plaintiff can recall being made occurred in 2011 or earlier. The record contains only vague, equivocal, and contradictory statements by Plaintiff indicating that she was also threatened with transfer in 2015. Plaintiff agreed at oral argument that in order for her retaliation claim to be timely, she must have actually been

8

threatened with transfer in 2015, as she claims, and not merely in 2011 and earlier. Asked at oral argument what evidence in the record precisely showed that she was threatened with transfer in 2015, Plaintiff directed the Court only to her CHRO complaint and to page 65 of her deposition.

However, as Plaintiff conceded at oral argument, the CHRO complaint makes no specific reference to a threat of transfer. Instead, Plaintiff merely asserts in the CHRO complaint that beginning in February 2015, she "began to experience harassment in the workplace from coworkers and from Dave Lawson, . . . my current supervisor." (CHRO Complaint [Doc. # 40-3] at 90.) By contrast, in her deposition, Plaintiff clearly testified that she had been threatened with transfer but seemed to place that claimed retaliatory action as having only occurred far earlier than 2015. Plaintiff was asked, with respect to her Complaint's allegation that she was "told in February 2015 that [she] would be transferred to a different office[,]" "[t]his took place in 2015?" (Senior Dep. at 60.) Plaintiff responded, "[n]o, it was earlier than 2015." (*Id.*) Later in her deposition, Plaintiff was asked the following question:

> Q: Okay. And so when you say in your complaint that this happened in February 2015, um, that's different from what you are telling me today. You are telling me today that the discussions about transfer took place during this 2005 to 2008 time frame. Did anyone threaten you in February or tell you in February 2015 that you were going to be transferred?

(*Id.* at 65.)

Plaintiff responded:

A: You know, it is possible. It was a long time. And now - - I mean, they - - and I am sure that he did, because, I mean, that was the reason for the 2015 letter. I mean, Dave says stuff all the time. . . . I mean, I really don't remember yearwise, but, I mean, he has said it.

9

(*Id.*) At oral argument, Plaintiff's counsel conceded that nothing in the record sheds any light on what 2015 letter Plaintiff was referring to in her deposition.

In summary, nothing in the record identifies with any specificity or clarity that Plaintiff was in fact threatened with transfer in 2015. As described above, Plaintiff's CHRO complaint makes no mention of a threat of transfer whatsoever. And in light of Plaintiff's definitive statement elsewhere in her deposition that the threat of transfer occurred only far earlier than 2015, Plaintiff's equivocal statement that "it is possible" that she was threatened with transfer in 2015 fails to establish a genuine dispute as to the material fact of whether Plaintiff was subjected to any non-time-barred adverse employment actions. Accordingly, Defendant's Motion for Summary Judgment must be granted.

### III. Conclusion

For the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of May 2019.